**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MARIA GUZMAN,

      Plaintiff,

      v.

VILLAGE OF STICKNEY, JAMES SASSETTI,
JERRY CHLADA, JR., and FRANK
FIGUEROA,

      Defendants.

No. 24 CV 4606

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Maria Guzman was a police officer with the Village of Stickney for over a decade. In June 2022, she gave birth and took three months of parental leave. When she returned to work, she had to balance the demands of being a full-time police officer with having a newborn, a sick daughter, and an injured husband all at home. Part of that challenge was finding times and places to pump breast milk. The police department provided a locker room for Guzman to take lactation breaks in, but she now contends that those breaks were discouraged and the facilities were inadequate under state and federal law. When Guzman tried to assert her rights to adequate lactation breaks and spaces, she was moved to the night shift, causing significant personal and familial difficulties.

Defendants, the Village of Stickney and three of its current and former police officers, maintain that they fully complied with their legal obligations and accommodated Guzman. As defendants see things, Guzman took increasingly lengthy

breaks, repeatedly violated Department policies, and was untruthful when asked about those violations in formal administrative investigations. As a result, her employment was terminated.

After exhausting administrative remedies, Guzman brought this suit, alleging defendants discriminated against her on the basis of sex, retaliated against her for asserting her rights as a nursing mother, and failed to comply with state and federal requirements to provide nursing mothers with adequate breaks and spaces to express breast milk at work. Defendants now move for summary judgment. [32]. For the reasons discussed below, the motion is granted.

## I.     Legal Standards

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, I view the facts and draw all inferences in the light most favorable to the nonmoving party. *Smith v. Kind*, 140 F.4th 359, 362, 364 (7th Cir. 2025).

## II.    Local Rule 56.1

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415

2

(7th Cir. 2019). The moving party must file a statement of facts that demonstrates its entitlement to judgment as a matter of law. *See Petty v. City of Chi.*, 754 F.3d 416, 420 (7th Cir. 2014); N.D. Ill. Local R. 56.1(a)(2). The nonmoving party must file a response to that statement and may provide a separate statement of additional facts. N.D. Ill. Local R. 56.1(b)(2)–(3).

Both statements of facts and additional material facts must consist of concise numbered paragraphs, supported by citations to specific pages in the evidentiary record. See N.D. Ill. Local R. 56.1(d)(1)–(2). The non-moving party must cite specific, admissible evidence to dispute an asserted fact and concisely explain how the cited material controverts the asserted fact. N.D. Ill. Local R. 56.1(e)(3). Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. *Id.*; *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

Defendants object to every denial in plaintiff's 56.1 response. *See* [50] at 3.[1] Defendants are, for the most part, correct that plaintiff's responses either fail to cite specific evidence, are non-responsive to the stated fact, or consist of impermissible legal arguments. That is not true for all of plaintiff's denials, however. The following facts are deemed admitted because the factual material cited does not create a genuine dispute: ¶¶ 22, 44, 54, 57, 61, 63, 66 & 69. The following facts are deemed

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number.

admitted because Guzman's denials were non-responsive: ¶¶ 20, 21, 70 & 72.[2] And the following facts are deemed admitted because the denials consist only of legal argumentation: ¶¶ 1, 8, 18, 19, 24, 27, 30, 32, 39, 41–43, 46, 47, 52, 53, 55–57, 62, 64 & 71.

### III.    Facts

Maria Guzman was employed as a patrol officer by the Stickney Police Department from April 2012 to July 21, 2023. [50-1] ¶¶ 1, 13.[3] Defendant Village of Stickney operates the Stickney Police Department. [50-1] ¶ 2. On June 4, 2022, Guzman gave birth to her son and took parental leave under the Family and Medical Leave Act. [50-1] ¶¶ 13–15. Guzman was fully compensated during her leave through a combination of medical leave, personal leave, and vacation leave, until she returned to work on September 2, 2022. [50-1] ¶¶ 16–17.

On her return, Guzman met with Stickney Chief of Police James Sassetti[4] and Corporal Mark Kozelka (Kozelka was Guzman's direct supervisor from her return until February 6, 2023). [51] ¶ 1; [50-1] ¶ 17. She informed them that she was

---

[2] In her response to defendants' statement of material facts, Guzman misnumbers paragraphs and deletes a citation from the original statement of material facts she was responding to. *Contrast* [34] *with* [44]. With their reply, defendants submitted a corrected version with changes redlined. [50-1]. Aside from the clearly indicated alterations, defendants' submission is an accurate representation of plaintiff's response. *Compare* [44] *with* [50-1]. To maintain consistent paragraph number, I cite to the version of Guzman's response attached to defendant's reply brief. [50-1].

[3] The facts are largely taken from the corrected version of Guzman's response to defendant's statement of material facts, [50-1], and defendant's response to Guzman's statement of additional material facts, [51], where both parties' assertions and responses are set forth in each document.

[4] Since this action was filed, Sassetti has retired and former-Deputy Police Chief of Administration Jerry Chlada, Jr. has been elevated to Chief of Police.

breastfeeding and would need to express milk at work and did not raise questions about where to take lactation breaks. [51] ¶ 1. Department policy, consistent with state and federal law, required lactation spaces to be a private location "other than a bathroom or toilet stall," shielded from view and free from intrusion by co-workers or the public. [34-9] § 1018.4. The parties dispute whether Guzman was told initially that she could use Kozelka's office for lactation breaks, [51] ¶¶ 1, 7, but all agree that Guzman set up a station to express milk in the women's locker room shortly thereafter, [50-1] ¶ 20; [51] ¶ 8.

The women's locker room was only accessible through the women's bathroom, but it was separated from the bathroom with a door that could be locked. [50-1] ¶ 21; [34-11]. The interior door separating the locker room and bathroom had a narrow window above the handle. [51] ¶ 10; [34-11] at 4. The locker room was cleaned daily by an individual hired by the Village of Stickney. [50-1] ¶ 24. Guzman described dirt, dust, and standing water in the pumping area, but defendants dispute that characterization, and Guzman never expressed dissatisfaction with the woman's locker room being the designated location for her lactation breaks while working for the Department. [50-1] ¶ 22; [51] ¶ 14.

When Guzman took lactation breaks during her work shifts, she notified both dispatch and her direct supervisor. [50-1] ¶ 25. Guzman testified that Deputy Chief Frank Figueroa made inappropriate comments about her lactation breaks, including that she was taking excessive breaks and compared the duration of her breaks to Officer Ashley McDonald, another officer who was lactating. [51] ¶¶ 16–18. Figueroa,

by contrast, testified that "Officer Guzman's nursing was something [he] never discussed with her at all." [34-5] 16:2–11.

In December 2022, Guzman had a meeting, at her request, with Figueroa and Kozelka to discuss the removal of her probationary trainee. [51] ¶ 19. About two weeks later, Guzman emailed Kozelka and Officer Richard Jaczak in response to what she perceived as concerns from Figueroa at the meeting regarding her breaks. [51] ¶ 21; [34-18]. Guzman attached a doctor's note to the email confirming that she was breastfeeding her infant and citing protections for nursing mothers provided by the Fair Labor Standards Act. [51] ¶ 21; [34-18]. That email was forwarded to Figueroa, who replied clarifying his position and attaching a copy of the Department's Lactation Policy. [51] ¶ 22; [34-19].

In February 2023, Guzman was reassigned to the midnight shift by Police Chief Sassetti. [50-1] ¶ 42. According to Sassetti, the decision was made based on the operational needs of the Department to make each shift more productive. [50-1] ¶ 44. Following the shift change, at her request, Guzman met with Sassetti, Figueroa, midnight shift Watch Commander Kevin McGuire, and (acting as her union steward) Detective Sergeant Cruz Ortiz. [50-1] ¶ 44; [45-2] 19–22. That meeting was memorialized in a memorandum written by Figueroa. [50-1] ¶ 44; [45-2] 19–22. At the meeting, Sassettti stated that the decision to change Guzman's shift "had nothing to do with her performance" and that "based on seniority she was the lowest on the day shift" under the collective bargaining agreement. [51] ¶ 28; [45-2] 19–20. The

memorandum also observed that Guzman became emotional at times during the meeting, raising her voice due to distress over family issues. [51] ¶ 28.

Following her reassignment, Guzman only took two to three lactation breaks during a 12-hour shift. [51] ¶ 30. Per her account, Guzman delayed pumping to avoid additional scrutiny and twice expressed milk in gas-station bathrooms while on duty. [51] ¶ 31. Defendants dispute that Guzman was scrutinized for her lactation breaks. [51] ¶ 31. Guzman further testified that delays and stress led to decreased supply, engorgement, discarded milk, and early cessation of breastfeeding. [51] ¶ 33. Guzman then requested and was granted a second FMLA leave period extending from March 10 to June 5, 2023, to care for her daughter. [50-1] ¶ 31; [1] ¶ 80. Guzman could not recall taking any lactation breaks during her work shifts after returning from leave on June 5, 2023. [50-1] ¶ 32.

In late February 2023, Administrative Deputy Chief Jerry Chlada Jr. received a report from Figueroa on Guzman's conduct relating to a DUI arrest from February 22, 2023. [50-1] ¶¶ 47, 50. In response to that report, Chlada initiated a formal administrative investigation under Administrative Investigation #23-004. [50-1] ¶ 47. Chlada was hired by the Village of Stickney in September 2022 and had very little interaction with Guzman prior to her termination. [50-1] ¶ 49. Due to her leave, Guzman was notified of the investigation when she returned in early June 2023. [50-1] ¶ 50. Guzman was formally interrogated by Chlada on June 15, 2023. [50-1] ¶ 51. After comparing Guzman's sworn testimony with the accounts of other

witnesses to the events surrounding the DUI arrest, Chlada concluded that Guzman was untruthful during her interrogation. [50-1] ¶¶ 52–54.

After completing his investigation, Chlada met with Sassetti and strongly recommended terminating Guzman's employment with the Department based on her engaging in multiple policy violations, including dishonesty. [50-1] ¶¶ 55–57. Sassetti concurred with Chlada's findings, agreed with his recommendation, and made the final decision to terminate Guzman's employment. [50-1] ¶ 58. Sassetti issued a letter to Guzman on July 21, 2023, terminating her employment, effective immediately. [50-1] ¶ 60.

During Chlada's administrative investigation, Figueroa conducted a second investigation, Administrative Investigation #23-010, into possible violations of the Department's body worn camera policy. [50-1] ¶¶ 61–63. That investigation concluded that Guzman violated Department policies and was untruthful in her written statements submitted as part of the investigation. [50-1] ¶ 64. Sassetti testified that, while AI #23-010 further supported the conclusion that Guzman had a pattern of dishonesty, his decision to terminate Guzman's employment was based on the results of AI #23-004. [50-1] ¶¶ 65–66.

## IV.    Analysis

Guzman's complaint asserted seven counts for violations of state and federal law. [1]. Against the three individual defendants, Guzman brings a single claim under state law for retaliatory discharge. [1] ¶¶ 83–92. Against the Village, she brings a claim for employment discrimination under Title VII of the Civil Rights Act of 1964; retaliation claims under Title VII, the Fair Labor Standards Act, and state law; two

claims relating to her rights to lactation breaks under state and federal law; and one claim for indemnification of the individual officers named in the retaliatory discharge claim. [1].

After defendants moved for summary judgment, Guzman abandoned claims against the individual defendants, *see* [48] at 5 n.1 ("Plaintiff voluntarily dismisses … Counts VI and VII against Sassetti, Chlada, and Figueroa."), so judgment is entered in favor of Sassetti, Chlada, and Figueroa. With no individual defendants remaining, judgment in favor of the Village on the claim for indemnification follows. Guzman also narrowed the scope of her employment discrimination claim, focusing on lactation accommodation and discriminatory termination. [48] at 5 n.1.

## A. Federal Claims

### 1. *Sex Discrimination*

Title VII makes it unlawful for an employer to discriminate against any individual with respect to the terms or conditions of their employment because of their sex. 42 U.S.C. § 2000e-2. At the summary-judgment stage, the proper question to ask is whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's sex caused the plaintiff's discharge or other adverse employment action. *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

One method of analyzing a discrimination case is the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff must first meet her burden of production by establishing that: (1) she is a member of a protected class; (2) she performed her job

9

to her employer's expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment. *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). "The burden then shifts to the employer to present a 'legitimate, non-discriminatory reason' for the employment decision." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023) (citing *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021)). "If the employer presents a legitimate reason, the burden shifts back to the employee to show the proffered reason is a pretext for discrimination." *Vichio*, 88 F.4th at 691 (citing *Bless*, 9 F.4th at 574).

The other approach, from *Ortiz v. Werner Enterprises, Inc.*, looks "at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination." *Vichio*, 88 F.4th at 691 (citing *Ortiz*, 834 F.3d at 765). Guzman presents her case under both the burden-shifting framework of *McDonnell Douglas* and the holistic approach from *Ortiz*, so I analyze the evidence under each in turn.

There is no dispute that Guzman is a member of a protected class. As clarified by the Pregnancy Discrimination Act, discrimination "on the basis of sex" in Title VII includes, but is not limited to, discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k); *E.E.O.C. v. Wal-Mart Stores E., L.P.*, 46 F.4th 587, 593 (7th Cir. 2022).[5] In addition to being female, Guzman was nursing during the relevant period, and discriminating against her

---

[5] Although not advanced by Guzman in this case, the Pregnancy Discrimination Act also allows a plaintiff to assert a pregnancy discrimination claim under a disparate-impact theory of liability. *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 212–213 (2015).

because she needs lactation breaks would qualify as discrimination based on a medical condition related to pregnancy or childbirth. *E.E.O.C. v. Houston Funding II, Ltd.*, 717 F.3d 425, 428 (5th Cir. 2013) (holding that "lactation is a related medical condition of pregnancy for purposes of the PDA").

Guzman has also met her burden of production that she suffered an adverse employment action. Establishing an adverse employment action is not a high bar— the plaintiff need only show "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 355 (2024). The action "must have left her worse off, but need not have left her significantly so." *Id.* at 359.

Indisputably, termination is an adverse employment action. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) ("A termination is of course a materially adverse employment action."). Moving Guzman to night shifts also qualified as an adverse employment action. For a Title VII claim of employment discrimination, "delaying training, denying vacation times, transferring shifts, and considering family circumstances in a biased way are all adverse actions." *Arnold v. United Airlines, Inc.*, 142 F.4th 460, 470–71 (7th Cir. 2025) (citing *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1336–1337 (7th Cir. 2024)). Guzman testified that the shift change affected her family circumstances and substantially reduced the amount of time she was able to spend with her newborn son. [34-4] 186:5–187:23. That is sufficient to establish an adverse employment action. *See Thomas*, 120 F.4th at 1337 (noting that "inability to care for a child is a deeply felt loss for all parents").

Guzman also argues that she "suffered adverse actions in the form of noncompliant, bathroom accessible pumping conditions." [48] ¶ 12. Considering the photographs of the locker room, [34-11], the fact that Guzman never once complained about the conditions of the locker room, [50-1] ¶ 22, and Guzman's testimony that she chose the locker room to set up a station after Kozelka's office was not reliably accessible, [34-4] 42:2–46:4, no jury could conclude that the location was so inadequate as to modify the terms or conditions of her employment. To the extent Guzman grounds her claim in discouraging remarks from her superiors, reprimands are not actionable as adverse employment actions. *Arnold v. United Airlines, Inc.*, 142 F.4th 460, 471 (7th Cir. 2025) (citing *Rios v. Centerra Grp., LLC*, 106 F.4th 101, 112–13 (1st Cir. 2024) ("A mere admonition by a supervisor without any formal consequences is not an adverse employment action because it does not represent any disadvantageous change in the terms or conditions of the plaintiff's employment.")).

Guzman's claim first falters because she has failed to identify any similarly situated non-female employees who received better treatment. Two employees are similarly situated if they "deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Hanners v. Trent*, 674 F.3d 683, 692–93 (7th Cir. 2012) (quoting *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 540 (7th Cir.2007)).

As to her shift change, Guzman claims that Officers DeMato, Escobar, and Gonzalez were all less senior officers who could have been transferred to the midnight

12

shift but were not. [34-4] 190:14–191:12; *cf.* [45-2] at 17 (indicating hire date for all officers and Guzman's greater seniority). But the record does not support that claim. At the time of her shift change, all three of those offices were "probationary police officers" and thus not subject to placement based on seniority. [34-6] 90:10–15; [45-2] at 20. All non-probationary officers who remained on the day shift were more senior than Guzman or were on administrative leave. [34-6] 106:23–108:5. The probationary police officers are not similarly situated to Guzman, and the better treatment she claims some received—being assigned to a preferred shift with less seniority—does not appear anywhere else in the record.

As to her termination, Guzman does not identify any comparators at all. *See* [48] at 12 (identifying "three less-senior, non-lactating male patrol officers who remained on the day shift while Plaintiff … was moved to midnights," but no similarly situated comparators for her termination). Rather, the record reflects that, around the same time of the administrative investigations into Guzman's conduct, four male patrol officers were also subject to administrative investigation, and three of those were also found to have been dishonest during their investigation. [50-1] ¶ 70. Those three officers all resigned to avoid being terminated. [50-1] ¶ 71. Guzman has not carried her burden.

The final element of a prima facie case under *McDonnell Douglas*—whether the employee performed her job to her employer's expectations—overlaps with pretext, so the two can be dealt with at once. *See Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023) ("Where 'the issue of satisfactory performance

13

and the question of pretext overlap' because the employer has raised the employee's performance as the reason for the adverse employment decision, the court 'may skip the analysis of the *prima facie* case and proceed directly to the evaluation of pretext.'"); *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010).

To give rise to pretext, "explanations must actually be shifting and inconsistent." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881 (7th Cir. 2016) (quoting *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003)). "Merely providing multiple, or additional, reasons for an adverse employment decision does not establish pretext." *Saud v. DePaul Univ.*, 154 F.4th 563, 569 (7th Cir. 2025). "Pretext can be proven, among other ways, by evidence (1) that the employer's explanation has no basis in fact; (2) of 'ambiguous or suggestive comments or conduct;' or (3) of 'better treatment of people similarly situated but for the protected characteristic.'" *Paterakos v. City of Chi.*, 147 F.4th 787, 797 (7th Cir. 2025).

No reasonable jury could find, on this record, that the Department's stated reasons for changing Guzman's shift, and later firing her, were pretextual. As discussed above, Guzman has not identified any similarly situated officers who received better treatment. The Department's explanations are also well-grounded in established facts: Guzman's work shift was changed based on the operational needs of the Department, [50-1] ¶ 44, and she was terminated for being untruthful during a formal investigation, [50-1] ¶¶ 52–58. Being untruthful during an administrative investigation and repeatedly violating Department policies also supports the conclusion that Guzman was failing to meet her employer's job expectations. [50-1]

14

¶ 57. Her claim cannot survive summary judgment under the *McDonnell Douglas* framework.

Putting aside the burden-shifting framework and looking at all the evidence together, as *Ortiz* calls for, does not change the outcome. The Department has presented non-invidious explanations for the adverse actions it took against Guzman, and Guzman has presented almost no evidence to support a connection between the adverse actions and her sex. No reasonable factfinder could conclude that Guzman's sex was the cause of her shift change or termination on the record presented.

### 2. *Retaliation*

Guzman brings two retaliation claims under federal law—Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3). Retaliation claims under those two statutes have the same elements. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). For her unlawful retaliation claims to survive summary judgment, Guzman must offer evidence from which a reasonable jury could find that: "(1) [she] engaged in an activity protected by the statute; (2) [she] suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (quoting *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)).

"'Protected activity' is 'some step in opposition to a form of discrimination that the statute prohibits.'" *Ferrill*, 860 F.3d at 501 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011)). "It's not necessary that the employee opposed a practice that is *actually* prohibited by Title VII; the employee need only have a

15

'good-faith and *reasonable* belief that [she] is opposing unlawful conduct.'" *Ferrill*, 860 F.3d at 501 (quoting *O'Leary*, 657 F.3d at 631) (emphasis in original).

The only conduct Guzman argues qualifies as "protected activity" is her December 2022 email to Kozelka and Jaczak. *See* [48] at 17. The email, [34-18] at 1, reads in full:

> Hello Supervisor A & B!
>
> On December 5, 2022 meeting w/ DC Figueroa he expressed some concerns regarding my breaks. Attached please find my Doctor's note for proper filing records.
>
> I realize the importance of being on the street and will continue to utilize my 15 minute breaks and lunch break to pump. I will continue to try to look for ways to place me back out on the street faster. Thank you for your continued assistance and support in this matter.

Guzman also attached a note from her doctor supporting that she was breastfeeding her infant and that she has a right to break time for breast feeding under the Fair Labor Standards Act. [34-18] at 3.

To the extent Guzman's email addresses her nursing needs, it touches on discrimination prohibited by Title VII and the FLSA. *See* 42 U.S.C. § 2000e(k); 29 U.S.C. § 207(r) (repealed December 29, 2022). Whether attaching a doctor's note "for proper filing records" qualifies as a step in opposition to discrimination—especially in light of the fact that Guzman never otherwise complained about the accommodation of her lactation breaks, [50-1] ¶ 22—is a closer call. Drawing all inferences in Guzman's favor, however, I accept that the December 20, 2022 email qualified as statutorily protected activity. For the same reasons discussed in relation

16

to her sex discrimination claim, her shift change and termination qualify as adverse employment actions. *See above* IV.A.1.

Guzman's retaliation claims still fail, however, because she has not presented sufficient evidence to support causation. Suspicious timing is rarely enough to create a triable issue and defeat summary judgment. *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959–60 (7th Cir. 2021). "For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012); *see also Igasaki*, 988 F.3d at 959 (holding that a two-month gap between protected activities and termination cannot show retaliation on its own). To infer a causal connection in the face of a prolonged gap between the protected conduct and the adverse action, there needs to be "evidence of prolonged antagonism against the plaintiff, evidence that, despite a long gap, the alleged retaliation was the first opportunity for retaliation, or something similar." *Lesiv*, 39 F.4th at 920.

Guzman was moved to the night shift a month and a half after her claimed protected activity—too long of a gap to support causation on its own. *See Kidwell*, 679 F.3d at 966. She presents no evidence supporting that Sassetti—the decisionmaker for both alleged adverse employment actions—was antagonistic towards Guzman or motivated by retaliatory intent. To the contrary, the record indicates that Sassetti's decisions had either nothing to do with Guzman's protected activity, [50-1] ¶¶ 57–58 (terminating Guzman for her multiple policy violations), or

17

nothing to do with Guzman at all, [45-2] at 19–20 (stating that Sassetti's decision to adjust shifts was in no way a reflection on Guzman).

Guzman does not appear to argue that Sassetti or Chlada had retaliatory intent towards her, *see* [50-1] ¶ 68, but instead argues for a "cat's paw" theory of liability based on Figueroa's comments towards and bias against her. *See* [48] at 18–19. A cat's paw theory "applies when a biased supervisor 'who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021) (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)). "But the mere fact that an employee's wrongdoing was reported by a biased supervisor with a retaliatory or discriminatory motive does not establish liability under a cat's paw theory." *Vesey*, 999 F.3d at 462. "Rather, a plaintiff must show that the biased supervisor's actions were a proximate cause of the adverse employment action." *Id.* If an employer believed it had independently sufficient reasons to take an adverse employment action without relying on the credibility of the biased supervisor, "then the employee's cat's paw theory will fail for lack of proximate cause." *Id.*

Guzman has presented no evidence to contradict Sassetti's testimony that AI #23-004 was sufficient to terminate her. [50-1] ¶ 65. Guzman argues that Sassetti's statement that AI #23-010 "further supported" termination undercuts the notion that AI #23-004 was independently sufficient, but providing multiple or additional reasons for adverse employment actions does not establish pretext. *Saud*, 154 F.4th at 569.

18

While Chlada initiated his investigation after a report from Figueroa, [34-17] at 4, the record is clear that his recommendation to terminate Guzman was based on her dishonesty during the investigation, not based on Figueroa's report. *See* [50-1] ¶¶ 47–57; [34–17]. A cat's paw theory of liability cannot defeat the conclusion that the Department's motives were not pretextual.

### 3. *PUMP Act*

Guzman also brings a claim under the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act). The PUMP Act requires employers to provide breastfeeding accommodations in the workplace. *See* 29 U.S.C. § 218d. It was signed into law on December 29, 2022, to be effective April 28, 2023. 29 U.S.C. § 215 note (setting the effective date of § 215(a)(6) as 120 days after the date of the enactment).

The presumption against statutory retroactivity defeats Guzman's PUMP Act claim. Absent "explicit words" or "clear implication" to the contrary, statutes creating a new cause of action are inapplicable to cases arising before the effective date. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 284 (1994) (citing *Winfree v. N. Pac. R. Co.*, 227 U.S. 296, 301 (1913)). The PUMP Act expressly sets an effective date 120 days after the enactment of the statute and contains no language to support retroactive application. *See* PUMP for Nursing Mothers Act, Pub. L. 117-328, 136 Stat. 6093 (2022). The PUMP Act was effective on April 28, 2023, and nothing in the record indicates that Guzman expressed breast milk at work after she took her second leave on March 10, 2023. [50-1] ¶¶ 31–32. Guzman does not address the retroactivity issue in her response, *see* [48] at 15–16, so arguments in favor of

retroactive application are forfeited. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (arguments not raised in response are forfeited).[6]

### B.     State Law Claims

Having dismissed the federal claims, I must decide whether to retain jurisdiction over and decide the state law claims. "A federal court's decision to exercise supplemental jurisdiction over state law claims is discretionary. Absent unusual circumstances, district courts relinquish supplemental jurisdiction over pendent state law claims if all claims within the court's original jurisdiction have been resolved before trial." *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 352 (7th Cir. 2019) (citations omitted); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) (observing that, in this circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial").

District judges, however, are "given broad power in determining whether it is appropriate to retain jurisdiction over the state law claims." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 385 (7th Cir. 2016) (quoting *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 728 (7th Cir. 1998)) (cleaned up). When deciding whether to exercise supplemental jurisdiction under § 1367, I "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chi. v. Int'l Coll. of*

---

[6] Guzman did not assert any rights under 29 U.S.C. § 207(r) (repealed December 29, 2022), the predecessor to the PUMP Act in effect at the time she was nursing.

*Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

There is substantial overlap between the claims for retaliation under Illinois and federal law. The factual record has been developed enough to decide both of the remaining claims under state law, and it would be a waste of a state court's time and resources to have to (as explained below) apply a statute of limitations and a substantially similar analysis to retaliation that I have already performed for the federal claims. Judicial economy, convenience, fairness, and comity justify retaining jurisdiction and reaching the state law claims.

      1.      *Illinois Nursing Mothers in the Workplace Act*

The parties dispute whether the Illinois Nursing Mothers in the Workplace Act provides a cause of action in the first instance. *Contrast* [33] at 5–6 *with* [48] at 13. The INMWA does not expressly create a remedy, so any private right of action would need to be implied. *See* 280 ILCS 260/1 *et seq*. Illinois courts imply a private right of action if "(1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute." *Fisher v. Lexington Health Care, Inc.*, 188 Ill.2d 455, 460 (1999). Illinois courts only imply private rights of action under a statute "in cases where the statute would be ineffective, as a practical matter, unless such an action were implied." *Metzger v. DaRosa*, 209 Ill.2d 30, 39 (2004) (quoting *Fisher,* 188 Ill.2d at 464).

21

Looking at the Act as a whole, the provisions evince a design to regulate the employer-employee relationship and provide additional protections to nursing mothers. *See* 280 ILCS 260/1 *et seq.*; *Fischer*, 188 Ill.2d at 463 ("In interpreting legislative enactments, courts must read the statute as a whole, not as isolated provisions."). Guzman, a nursing mother in the workplace during the first year after she gave birth, is someone who the statute was intended to benefit. *See* 820 ILCS 260/10. Guzman's claimed injury, lack of a private place to express breastmilk, is also a harm the statute was designed to prevent. *See* 820 ILCS 260/15. Providing a right of action would be consistent with the underlying purpose of the statute. And, unlike the extensive administrative procedures and enforcement mechanisms seen in *Metzger*, the INMWA does not provide any express remedies for a violation. *See Metzger*, 209 Ill.2d at 40. Implying a private right of action for the INMWA is a necessary step to remedy violations of the Act. *See also Spriesch v. City of Chi.*, 2017 WL 4864913, at *5 (N.D. Ill. October 26, 2017) (holding the same and looking only at the INMWA to decide whether an effective remedy exists within the statute without an implied private right of action).

I do not need to decide that issue, however, because the Illinois Tort Immunity Act bars such a claim in this case, whether the cause of action exists or not. The relevant section provides: "No civil action other than [those for damages arising out of patient care] may be commenced in any court against a local entity … for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101(a). The last possible date of accrual

for a claim was March 10, 2023, the day Guzman began her second leave. Guzman did not return to work until June 5, 2023, one year and one day after the birth of her son, and thus could not have accrued any additional injuries under the INMWA after her return. [50-1] ¶ 31. This suit was not brought until June 3, 2024, [1], several months after the Tort Immunity Act extinguished any claims she may have accrued prior to March 10, 2023. The claim, if one exists, is time barred.

### 2.    *Retaliatory Discharge*

To establish a retaliatory discharge claim under Illinois law, "the plaintiff must plead and prove that she was '(1) discharged; (2) in retaliation for her activities; and (3) that the discharge violates a clear mandate of public policy.'" *Blount v. Stroud*, 232 Ill.2d 302, 314 (2009) (quoting *Hinthorn v. Roland's of Bloomington, Inc.*, 119 Ill.2d 526, 529 (1988)); *see also Teruggi v. CIT Grp./Cap. Fin., Inc.*, 709 F.3d 654 (7th Cir. 2013) (applying the same). While distinct from the test under federal law, Guzman's retaliatory discharge claim under Illinois law fails for the same fundamental reason: she has not shown a causal connection between her protected activity and her termination. *See above* IV.A.2. Without any additional evidence to connect Guzman's December 20, 2022 complaint to her July 21, 2023 termination, the timing alone is not suspicious. The retaliatory discharge claim fails.

## V.       Conclusion

Defendants' motion for summary judgment, [32], is granted. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: May 6, 2026

24